**Richmond**

VIRGINIA P. HOGAN

v.

ROBERT JACKSON CARTER AND
WILLIAM FRANZ GRINSTEAD

Record No. 810041.

WILLIAM FRANZ GRINSTEAD

v.

ROBERT JACKSON CARTER AND
VIRGINIA P. HOGAN

Record No. 810065.

ROBERT JACKSON CARTER

v.

VIRGINIA P. HOGAN AND
WILLIAM FRANZ GRINSTEAD

Record No. 810090.

December 2, 1983.

Present: All the Justices.

*Richard W. Davis (Davis, Stone & Wall*, on briefs), for appellant. (Record No. 810041.)

*James F. Johnson; Richard C. Rakes (Harvey S. Lutins; Jonathan S. Kurtin; Melissa J. Warner; Woods, Rogers, Muse,*

*Walker & Thornton; Lutins, Shapiro and Albert; Gentry, Locke, Rakes & Moore*, on briefs), for appellees. (Record No. 810041.)

*Jonathan S. Kurtin (Harvey S. Lutins; James F. Johnson; Lutins, Shapiro and Albert; Woods, Rogers, Muse, Walker & Thornton*, on briefs), for appellant. (Record No. 810065.)

*Richard W. Davis; Richard C. Rakes (Melissa J. Warner; Davis, Stone & Wall; Gentry, Locke, Rakes & Moore*, on briefs), for appellees. (Record No. 810065.)

*Richard C. Rakes (Gentry, Locke, Rakes & Moore*, on brief), for appellant. (Record No. 810090.)

*James F. Johnson (Richard W. Davis; Harvey S. Lutins; Jonathan S. Kurtin; Woods, Rogers, Muse, Walker & Thornton; Davis, Stone & Wall; Lutins, Shapiro and Albert*, on briefs), for appellees. (Record No. 810090.)

POFF, J., delivered the opinion of the Court.

We have consolidated three appeals from a judgment entered in two cases, consolidated for trial, which arose out of a two-car collision. Mrs. Virginia Hogan, a passenger in a car driven by her grandson, Robert Jackson Carter, claimed damages for personal injuries against Carter and William Franz Grinstead, the driver of the other car. Grinstead sued Carter, claiming damages for personal injuries. A jury found for Carter in Grinstead's suit and against both Carter and Grinstead in Mrs. Hogan's suit. The jury awarded Mrs. Hogan $50,000 in damages, the trial court ordered a remittitur of $25,000, Mrs. Hogan accepted the remittitur under protest, and the trial court entered judgments on the verdicts and the damage award as remitted. All three parties appeal.

The collision occurred about 10:00 p.m. on July 23, 1978 near one of the entrances to the Radford Shopping Plaza. Adjacent to that entrance is a McDonald's restaurant. The plaza is located on the south side of U.S. Route 11 just west of Radford. As described by the investigating officer, State Trooper Paul W. O'Dell, Jr., Route 11, a four-lane highway, divided at the time by double center lines, ran generally east and west. Each lane was 13 feet wide, the highway was straight with a slight downgrade heading east, the area was "fairly well-illuminated", and the speed limit was 40 m.p.h. The physical evidence showed that the impact occurred in the right eastbound lane "a foot or so" from the exten-

sion of the curb line at the plaza entrance. The eastbound car, driven by Grinstead, left 30 feet of skid marks beginning in the middle of the right lane and heading slightly to the right to the point of impact. Damage to the vehicles, both of which were a total loss, indicated that the front of the Grinstead car, a white Plymouth sport coupe, had struck the right front door of the Carter car, a four-door Chevrolet sedan. The Plymouth came to rest near the point of impact, the Chevrolet at the foot of an embankment in the plaza east of the entrance. Traffic lights were located on the highway 212 feet west of the point of impact, and a Gulf service station was located 242 feet farther west. The officer testified that Grinstead told him that "he was going forty-five to fifty through a green light". Carter's mother, seated beside the right front door, was killed, and Mrs. Hogan, seated next to her, was seriously injured. Grinstead, thrown against his windshield, sustained a blow to his head and injuries to his knees.

Called by Mrs. Hogan as an adverse witness, Carter, 19 years old at the time of the accident, testified that he stopped his car near the center lines in the westbound passing lane opposite the entrance to the plaza, engaged his left turn directional signal, and waited "for about a minute, minute and a half" for three oncoming cars to pass. Seeing no other traffic to the west, Carter began his turn. He said that, as he was crossing the eastbound passing lane, his grandmother "hollered, 'Robert,' and when I looked I seen some bright lights coming from a car". The car, which he first saw "just a second or two" before the collision, was approaching in "the lane next to the lines". "I gave all the gas to the car I could," Carter said, and "I remember thinking that I had got out of his way and was beginning to relax a little and let my foot up . . . and that's when I was hit." Carter estimated that the car he saw was traveling "at least fifty-five, maybe more."

Carter's brother, Ronnie, and his sisters, Velvet and Virginia, were riding in the back seat of his car. Asked whether the lights on the Grinstead car were burning, Virginia testified, "Not when I first turned around, I didn't see nothing. When Grandma hollered, I turned and looked, and then I seen the lights flash on". The lights, which were "a couple of car lengths away" in the eastbound passing lane, "moved over to the second lane and then it hit us."

Grinstead, 17 years old at the time, had been attending a birthday party at the home of his girlfriend. Her home was located in a

community with no street lights, and Grinstead testified he turned on his headlights as he left her driveway. He entered Route 11 approximately 1000 feet west of the scene of the accident and proceeded east in the right lane. The traffic lights ahead of him were green and, as he passed the Gulf service station, he saw that his speedometer registered "between forty-five and fifty." Grinstead explained that "I was just checking the speed so I could see if that light was going to change or not." Asked if he changed his speed at that point, he replied, "I don't know if I slowed down or speeded up" but the traffic lights "never did change". Grinstead testified that he remained in the right eastbound lane from the time he entered the highway and that he did not see the Carter automobile or its lights until it started across that lane.

Mary Phillips, standing in the plaza parking lot facing the traffic lights, testified that "I noticed [Grinstead's] car coming through the light, and the Carter car was turning into the McDonald's parking lot." Her attention was attracted to the Grinstead car because "[i]t was a white car" and because "he was travelling pretty fast" and "too fast for going through that spot."

Mrs. Hogan confirmed Carter's testimony that he had waited in the westbound passing lane with his left-turn signal blinking while three eastbound cars passed. At the time Carter started his turn, she saw no oncoming traffic. As Carter entered the turn, she looked to her right and saw a car in the eastbound passing lane "coming at us at a high rate of speed". In her "opinion" or "guess", Grinstead was traveling "sixty-five to seventy miles an hour." Mrs. Hogan "never did see any lights" but she was able to see the car because the area was "[p]retty well" illuminated. At one point she testified that Grinstead's car was "maybe three cars back" when she first saw it but, later, that it was "[u]nder the light." "I thought," she said, "that if [Carter] speeded up, he could get out of the way of the car. That's the last I remember, I blacked out."

On cross-examination, Mrs. Hogan was asked if she and Carter had had an equal opportunity to see everything that occurred. She replied, "Yes sir, I believe so." Carter's counsel also asked Mrs. Hogan, an experienced driver, whether, if she had been driving, she would "have felt like it was safe to make the turn at the time Robert [Carter] did". She replied, "Probably so."

## I.  GRINSTEAD'S APPEAL

Both Hogan and Carter moved to strike Grinstead's evidence and enter summary judgment against him. The trial court ruled that "Grinstead convicts himself of negligence on speeding" but that "the question of . . . proximate cause . . . should be presented to the trier of fact." Accordingly, the court overruled the motions and granted Instruction No. 8 in the following language:

> The Court instructs the jury that William Grinstead was guilty of negligence as a matter of law in driving in excess of the maximum speed limit. And if you further find that such negligence was a proximate cause of the collision with the Carter vehicle then you shall return your verdict in favor of Virginia Hogan against William Grinstead and also in favor of Robert Carter in the case of *Grinstead v. Carter*.

Appealing from the two judgments against him, Grinstead concedes that he was traveling in excess of the speed limit when he passed the Gulf service station and that such speed constituted negligence as a matter of law. But, he argues, "Grinstead's slightly excessive speed when still 454 feet or more from the place of collision is immaterial unless it continued to a point close enough to the accident to have been a contributing cause of it." He adds that "Instruction No. 8 was justified only if the evidence conclusively established that Grinstead's speed was still excessive when he reached that critical point."

Grinstead relies upon several cases in which we have held that evidence of excessive speed at one place on a highway is not sufficient, standing alone, to justify an inference of excessive speed at another place. But we have never held that this rule is absolute or that proof of speed at the moment of impact must be conclusive. *See Interstate Veneer Co.* v. *Edwards*, 191 Va. 107, 60 S.E.2d 4 (1950).

In *Interstate Veneer Co.*, the distance between the location of the witness and the scene of the accident was measured in yards. In the cases Grinstead cites, the distance was measured in miles. *King* v. *Commonwealth*, 217 Va. 601, 231 S.E.2d 312 (1977) (more than two miles); *Grasty* v. *Tanner*, 206 Va. 723, 146 S.E.2d 252 (1966) (two and eight-tenths miles); *Grinstead* v. *Mayhew*, 167 Va. 19, 187 S.E. 515 (1936) (one and one-fourth miles).

Here, Grinstead testified at trial and acknowledged on brief that he was exceeding the speed limit at a point 454 feet from the plaza entrance. The investigating officer testified that Grinstead told him the night of the accident that "he was going forty-five to fifty through a green light" located only 212 feet west of the point of the collision.

Other evidence supported the conclusion that the Grinstead car was traveling at an excessive speed at "a point close enough to the accident to have been a contributing cause of it." Mary Phillips thought he was traveling "too fast for going through that spot [the traffic lights]." Carter estimated Grinstead's speed immediately before the impact to be "at least fifty-five" and, in Mrs. Hogan's opinion, it was "sixty-five to seventy miles an hour." While the estimates made by Carter and Hogan were based on little more than a fleeting glance, the physical evidence, including the extensive damage to both cars, was "mute evidence of high speed" at the moment of impact. *Interstate Veneer Co.*, 191 Va. at 112, 60 S.E.2d at 6. It is also significant that Grinstead could not remember whether he reduced or increased his speed after he passed the Gulf service station until he applied his brakes 30 feet before he struck the Carter car.

We are of opinion that reasonable minds could not differ that Grinstead was traveling at an unlawful speed at the time he applied his brakes. Consequently, we uphold the trial judge's ruling that Grinstead was guilty of negligence as a matter of law, and we reject Grinstead's challenge to Instruction No. 8.

## II. CARTER'S APPEAL

### A. Primary Negligence

Appealing from the judgment against him in Mrs. Hogan's suit, Carter contends that "Grinstead's speed and utter failure to keep any lookout whatever were the sole proximate cause of the collision." There was no evidence, he maintains, to support a finding that he was guilty of negligence which contributed to the accident. We do not agree.

Code § 46.1-216 provides that "[e]very driver who intends to . . . turn . . . from a direct line shall first see that such movement can be made in safety". "The driver of a vehicle, intending to turn to the left . . . into an alley, private road or driveway shall yield the right-of-way to any vehicle approaching from the oppo-

site direction which is so close as to constitute a hazard . . . ." Code § 46.1-222. A driver turning left must exercise ordinary care in the discharge of the duties conjunctively imposed upon him by these two statutes. *Southers* v. *Price*, 211 Va. 469, 472-73, 178 S.E.2d 685, 687 (1971) (citing *Atwell* v. *Watson*, 204 Va. 624, 631, 133 S.E.2d 552, 557 (1963)). Underlying these statutory duties is the common law duty to maintain a reasonable lookout for other traffic. "Implicit in the requirement of the use of reasonable and ordinary care to see that a turn can be made with safety is the duty to keep a reasonable lookout for oncoming vehicles and to see any such vehicles approaching in plain view." *Von Roy* v. *Whitescarver*, 197 Va. 384, 391, 89 S.E.2d 346, 351 (1955); *accord Shelley and Miller* v. *West*, 213 Va. 611, 616, 194 S.E.2d 899, 903 (1973).

The evidence is uncontradicted that Carter engaged his left-turn signal and waited before beginning his turn until three eastbound cars had passed. At that point, there was no traffic between him and the traffic lights. But the testimony of a disinterested witness shows that at the moment Carter was *entering* his turn, the Grinstead car was passing through the traffic lights only 212 feet away.

Obviously, at the moment before Carter began his turn, the Grinstead car was only a short distance west of the traffic lights, and those lights were green in Grinstead's favor. Carter concedes, as he must, that his "duty did not extend to the traffic light and terminate there." In determining whether his turn could be made in safety, Carter had a duty to see what was there to be seen. His view to the west was unobstructed by other traffic, the Grinstead car was white, and the area was "fairly-well illuminated". Under those circumstances, the jury could have believed that Carter should have seen Grinstead's car before it reached the traffic lights, even if, as Mrs. Hogan testified, its lights were not burning. And of course, the jury could have accepted Grinstead's testimony that his lights were burning. Yet, Carter admitted that he did not see the Grinstead car until he was crossing the eastbound passing lane and, then, only after Mrs. Hogan had called his attention to it.

Hence, the jury could have concluded that, at the time Carter was preparing to make his turn, the Grinstead car was "so close as to constitute a hazard", that Carter was negligent in failing to

perceive the hazard, and that his negligence concurred with that of Grinstead as a proximate cause of the accident.

### B. Rule in *Massie* v. *Firmstone*

Even so, Carter argues, "Mrs. Hogan's own testimony exonerated Carter from negligence, and she is precluded from recovery against him under the Massie-Firmstone doctrine."

A litigant "cannot be heard to ask that his case be made stronger than he makes it, where . . . it depends upon facts within his own knowledge and as to which he has testified." *Massie* v. *Firmstone*, 134 Va. 450, 462, 114 S.E. 652, 656 (1922). We have recently applied the rule in *Massie* and summarized the several exceptions recognized in later cases. *Travis & Ludwig* v. *Bulifant*, 226 Va. 1, 306 S.E.2d 865 (1983).

As defined, refined, and distilled in these cases, the rule relevant to actions in tort is that a litigant whose testimony, considered as a whole, conclusively absolves an alleged tortfeasor of actionable negligence forfeits the cause of action against him or, as the case may be, the defense of contributory negligence. The rule does not apply to mere estimates of fact, such as speed and distance, or to other statements of opinion.

In our view, Mrs. Hogan's testimony neither acquitted nor convicted Carter of actionable negligence. It is true that she confirmed Carter's contention that there was no traffic east of the traffic lights when Carter began his turn; but, to reiterate, this did not relieve Carter of his duty to see the Grinstead car west of that point, even if, as Mrs. Hogan said, its headlights were not burning. Mrs. Hogan "believe[d]" that Carter had no opportunity to see anything she had not seen. This testimony was an expression of opinion, not a statement of fact. And she did not owe the same duty of lookout that Carter owed. Mrs. Hogan felt that it was "probably" safe to make the turn at the time Carter did. Again, this is not a statement of fact; what is probably safe is possibly hazardous. Thus, Mrs. Hogan's statements, essentially opinionary, were equivocal as well.

As we have said, the evidence aside from Mrs. Hogan's testimony supports a finding that Carter breached the duties imposed upon him by the statutes and the common law and that such negligence was a proximate cause of the accident. Since Mrs. Hogan's testimony was not conclusively inconsistent with such a finding, we hold that the rule Carter invokes does not apply.

## III.  MRS. HOGAN'S APPEAL[1]

Mrs. Hogan acknowledges on brief that "the verdict returned by the jury . . . was larger than normal." Yet, she argues that the trial court abused its discretion in ordering a remittitur and that we should reinstate the verdict and enter final judgment against Carter and Grinstead, jointly and severally.

Mrs. Hogan's proof of damages consisted principally of medical and lay testimony concerning the nature and extent of her injuries and the pain and suffering she endured. Hospital, medical, and convalescent expenses totaled $2,155.38, and there was no evidence of loss of earnings or other economic damages.

Dr. George Tarasidis, who attended Mrs. Hogan during her five-day confinement in the hospital, testified that on admission, she complained of pain in her chest, spine, and back. X-rays of the chest and lumbar spine "were negative", and he attributed her pain in those areas to contused muscles and soft tissue damage. He said that "[t]he only abnormal finding we had was fracture of pelvis". He described the break as a nondisplaced fracture, "a very small line . . . in the upper part of the pelvic bone." Aside from medication to relieve pain, the only treatment required was bed rest and physical therapy.

When Dr. Tarasidis saw her again on September 1, 1978, Mrs. Hogan had no complaints about pain in her back or neck but was still experiencing pain in the pelvic region. New X-rays taken October 3, 1978 revealed that the fracture had healed and that the pelvis was in proper alignment. Prior to the accident, Mrs. Hogan had suffered with heart disease, diabetes, and osteoarthritis. An X-ray taken three weeks before trial confirmed Mrs. Hogan's complaints of arthritis in her knee, and Dr. Tarasidis testified that an injury to a joint "will aggravate arthritic change". In response to a leading question on cross-examination, the witness agreed that Mrs. Hogan had made "a complete recovery" from the pelvic injury.

Dr. William L. Foster, Mrs. Hogan's family physician, did not testify, but counsel read into evidence a letter dated March 1, 1979 reporting the results of an examination Dr. Foster conducted on October 26, 1978. Mrs. Hogan consulted him about pain in her neck which she related to the accident. Dr. Foster found "some

---

[1] Mrs. Hogan died during the pendency of these appeals, but we will retain jurisdiction and her appeal will not abate. Code § 8.01-20.

residual soreness and stiffness" in her neck "but no limitation of motion." "X-rays of cervical spine revealed changes . . . associated with old osteoarthritis" which were "suggestive of old injury." Dr. Foster opined that "the accident did aggravate her pre-existing osteoarthritis, but she probably will have no permanent disability resulting directly from the accident as far as her neck is concerned."

Mrs. Hogan testified that, in the period following the accident, she had seen Dr. Foster "every one or two months". She paid Dr. Foster a total of $50.00 for these services, and the medicine he prescribed cost a total of $73.33. At the time of trial, Mrs. Hogan was still taking the medicine to relieve pain in her neck, back, and legs.

The testimony of Mrs. Hogan and members of her family showed that, prior to the accident, she did all her housework, including the cleaning, waxing, laundry, and cooking; that she attended to her personal needs without help; that she "babysat" the children; and that she was able to drive her own car. After the accident, she could do little more than cook her own meals without assistance.

We reaffirmed the standards of appellate review of an order of remittitur in *Bassett Furniture* v. *McReynolds*, 216 Va. 897, 224 S.E.2d 323 (1976). On appeal in such cases, this Court does not sit to determine whether a damage award is excessive as a matter of law. While a trial judge may not arbitrarily substitute his opinion for that of the jury, he has both the power and the duty to correct a verdict which he finds so excessive as to shock the conscience of the court or to compel the conclusion that the verdict was the product of passion or prejudice or some misunderstanding of the facts or the law. When the judge makes such a finding, it is our sole function to determine whether he has abused the discretion accorded him by the statutes and the common law.

We can make that determination only when the judge states the reasons underlying his decision. If the record on appeal contains no such statement, we will reverse the order of remittitur, reinstate the damage award, and, absent reversible error on the issue of liability, enter final judgment on the verdict. On the other hand, if the judge's statement shows that "in reaching his conclusion, he considered factors in evidence relevant to a reasoned evaluation of the damages incurred and to be incurred, his order will not be disturbed on appeal if the recovery after remittitur bears a

reasonable relation to the damages disclosed by the evidence." 216 Va. at 912, 224 S.E.2d at 332.

Here, the trial judge reduced his reasons to writing in a letter incorporated in the record. Pertinent portions are quoted in the margin.[2] Mrs. Hogan contends that the reasons the judge assigned were not supported by the record and do not justify the decision he reached.

Specifically, she argues that there is "nothing in the record to suggest that the jury was angered at either youthful defendant". As we have often noted, "[t]here are many incidents which occur in the trial of a common law case which a trial judge observes but which cannot be reproduced in the cold printed page." *American Oil Co.* v. *Nicholas*, 156 Va. 1, 12, 157 S.E. 754, 758 (1931). We did not see or hear the defendants as they testified. We do not know whether they appeared cooperative or defiant, responsive or evasive, candid or disingenuous. The trial judge was in a unique position to hear the tone and tenor of the dialogue, observe the demeanor of the witnesses, and assess the reaction of the jurors to

---

[2] Mrs. Hogan, an elderly lady, sustained a non-displaced fracture of the pelvis. She was in the hospital five days and received physical therapy during that time. When she was released from the hospital, she was using a walker. On October 3, 1978, she had x-rays and Dr. Tarasidis found them to be satisfactory. He did not see Mrs. Hogan again until June 10, 1980, apparently in preparation for trial. Dr. Tarasidis testified that Mrs. Hogan had arthritis at the time of the accident and that trauma often aggravates that condition. It was his opinion that Mrs. Hogan had made a complete recovery from the injuries sustained in the accident. Her medical bills amounted to $1404.63 and she paid her daughter $750.75 for looking after her during her recuperation, a total of $2155.38.

Mrs. Hogan testified that her back and neck pained her and that her knee would give out on her. In April, 1980, she saw Dr. Foster, who prescribed medication for pain. Mrs. Hogan testified that she had had mild arthritis for several years prior to the accident and that Dr. Foster told her that she had an aggravation of her osteoarthritis but that there was no permanent injury to her neck.

The verdict of $50,000.00 shocked the Court's conscience and appeared to be the product of anger toward the youthful drivers of the two cars for causing this unfortunate accident. The award also seemed to me to be so great and so out of proportion to the injuries sustained by the plaintiff as to suggest that it was not fair and impartial. If the jury was not angered, then it would appear that it misconceived the facts or the law of the case. Mrs. Hogan was only in the hospital five days; she sustained no economic losses except for the medical expenses and payment to her daughter above mentioned; and she had no permanent injury. She did not see a physician from October 3, 1978, until April, 1980, about two months before the trial date. It is true that there was evidence that her arthritis may have been aggravated by her injuries but that evidence was rather vague and general. When Mrs. Hogan went to see Dr. Foster in April, 1980, she was complaining of back and neck pain but Dr. Foster reported that there was no permanent injury to her neck. Dr. Tarasidis testified that Mrs. Hogan had made a complete recovery.

what they saw and heard. We cannot say that the trial judge had no grounds to conclude that the quantum of the damage award was influenced by passion or prejudice or, in the alternative, by some misunderstanding of the facts in evidence or the law of the case.

Mrs. Hogan further contends that the order of remittitur should be reversed because, she says, it was based on two misstatements of fact by the judge. In his letter opinion, the judge said that Mrs. Hogan "did not see a physician from October 3, 1978, until April, 1980, about two months before the trial date." In fact, Dr. Foster's letter states that he examined her for complaints of pain in her neck on October 26, 1978. Although the judge, who did not have the benefit of a transcript, was mistaken about dates, his letter opinion demonstrates that he was fully aware of the examination and the doctor's findings. Mrs. Hogan also points out that the judge did not mention her testimony that she had consulted Dr. Foster "every one or two months" after the accident and that he had prescribed certain analgesics. Presumably, this was because there was no medical evidence, testimonial or documentary, to show that the symptoms Dr. Foster treated on these visits were caused by injuries sustained in the accident.

Mrs. Hogan questions the judge's comment that "Dr. Tarasidis testified that Mrs. Hogan had made a complete recovery". She believes that the judge's understanding of the import of the doctor's testimony was overbroad. It is true, as she says, that the transcript shows that the words "complete recovery" appear in a dialogue related solely to the fractured pelvis. It is also true, however, that the witness testified that, aside from contused muscles and soft tissue damage, the fracture was the "only abnormal finding we had". And significantly, Dr. Tarasidis, Mrs. Hogan's own witness, was never asked whether his patient's injuries were temporary or permanent.

We conclude that the letter opinion, read as a whole, is well-grounded in the evidence of record and that the mistakes complained of were *de minimis* and harmless.

Finally, Mrs. Hogan asks us to adopt a rule that a trial judge sitting in a personal injury case is guilty of an abuse of discretion as a matter of law if he orders a remittitur when, as here, counsel for the defense "refuses to cross-examine the plaintiff or her witnesses as to damages, presents no evidence in mitigation and refuses to discuss the issue of damages with the jury."

Mrs. Hogan cites no authority for such a rule, and our research discloses none. The cases upon which she relies, which hold that a defendant has the burden of proving a plaintiff's breach of duty to mitigate damages, are wholly inapposite, and we decline to adopt the rule she urges.

Considering the evidence of record and the reasons articulated in the letter opinion, we cannot say that the trial court abused its discretion, and we will uphold the order of remittitur. And finding no merit in other assignments of error, we will affirm the judgments in the two cases underlying these appeals.

*Affirmed.*