## CIRCUIT COURT OF THE CITY OF ROANOKE

Shelby Blankenship, Adm'x of the
Estate of Jackie Allen Eppling,
deceased

v.

Commercial Distributors, Inc.,
t/a Southern Manor Home for Adults

October 27, 1989

Case No. CL88000562

By JUDGE DIANE McQ. STRICKLAND

On July 20, 1989, the jury returned a verdict in the amount of $500,000.00 for the plaintiff in this matter. This opinion will address plaintiff's motion to amend her *ad damnum* clause from $200,000.00 to $500,000.00 to conform to the verdict of the jury and defendant's motion to set aside the jury verdict.

The pertinent facts for consideration by the Court are as follows. Plaintiff's decedent, "Eppling," was a 46-year old diagnosed paranoid schizophrenic who resided at a licensed home for adults operated by the defendant, "Southern Manor," at the time of his death by suicide on January 30, 1988. Eppling had suffered from mental illness for more than twenty years and had been hospitalized on a number of occasions. When not in the hospital, Eppling

resided at the home for adults which was taken over by Southern Manor in 1985. The home had no medical staff and furnished no medical care except for administering drugs prescribed by the residents' treating physicians.

Eppling came under the care of Dr. Shah, a licensed psychiatrist, in May of 1986. On October 20, 1986, Eppling was seen by Dr. Shah on an emergency basis because a relative had found Eppling on Tenth Street talking about jumping off the Wasena Bridge. Eppling was hospitalized for several weeks and, when no longer considered suicidal, was discharged back to Southern Manor. Eppling was seen by Dr. Shah on several occasions during the spring of 1987. On June 8, 1987, Eppling was found on Wasena Bridge, talking about jumping off the bridge. He was taken by a police officer to the hospital where he was admitted under the care of Dr. Shah until July 2, 1987, when he was discharged back to Southern Manor. Eppling was seen by Dr. Shah in the office on several occasions thereafter throughout the fall of 1987.

In January, 1988, Eppling's condition deteriorated. The administrator of Southern Manor, "Hartman," noted that he was acting "progressively more delusional since before January 16, 1988." On January 17, Eppling called his psychiatrist and requested an increase in his medication. On January 27, Eppling reported to Shah's office with a packed suitcase requesting hospitalization. Dr. Shah counseled with Eppling and returned him to Southern Manor with a medical note reflecting that Eppling was "very paranoid and had hallucinations, but he promised to talk to or call me and not to act on it."

On January 28, Eppling left Southern Manor, walked to the home of his mother, Esther Eppling, age 76, and requested her help to secure hospitalization. Mrs. Eppling called Southern Manor and reported that Eppling was "bad off" and needed to go to the hospital. Eppling returned to Southern Manor, and on January 29, Hartman, concerned about his behavior, asked if he would voluntarily sign himself into Roanoke Memorial Rehabilitation Center. He refused, and Hartman did not pursue an involuntary commitment. On the evening of January 29, an aide wrote in the Southern Manor log that Eppling was "ranting and raving about everything off the wall." Later, Eppling was found lying in the bathroom groggy with a cut over his eye.

At midnight on the 29th, the Southern Manor shift changed, and aides Harris and Irving assumed responsibility for the residents. Neither Harris nor Irving had any medical or nursing training, and neither knew anything about Eppling's prior suicide threats. At approximately 6:50 a.m. on January 30, Harris found Eppling sitting up against the wall in the hallway complaining of stomach pains. The rescue squad was called, and Eppling requested that he be transported to Catawba Hospital, a psychiatric facility. He was told that the rescue squad could only take him to a local emergency room, which offer he refused. Shortly thereafter in the dining area, Eppling lit a cigarette at the breakfast table, against house rules, and then extinguished it in his milk. He also threw a glass of water in the face of an aide and called her an obscene name. Harris phoned Hartman about 8:15 a.m. to report the incidents and was advised that Hartman would seek involuntary commitment of Eppling. It is unclear whether Harris ever saw Eppling following this phone call; however, he was soon discovered to be missing.

Irving was never advised of the intention to hospitalize Eppling nor of Eppling's disappearance. Irving completed his shift, and shortly thereafter, on his way home from work, drove past Eppling walking on Tenth Street in the direction of Wasena Bridge. Eppling jumped off of the Wasena Bridge at approximately 9:30 a.m. on January 30, 1989, and died by drowning as a result of that act. At 10:05 a.m., Hartman secured a temporary detention order from a special justice to involuntarily commit Eppling to the hospital.

### Plaintiff's Motion to Increase the Ad Damnum

Plaintiff's motion for judgment requested judgment against the defendant in the amount of $200,000.00. Plaintiff has moved to amend her *ad damnum* to conform to the jury verdict of $500,000.00.

In *Powell v. Sears Roebuck and Company*, 231 Va. 464, 344 S.E.2d 916 (1968), the Virginia Supreme Court clearly established that post-verdict amendments to increase the *ad damnum* are not permissible. The Court cited *Russell Lumber Company v. Thompson*, 137 Va. 386, 119 S.E. 117 (1923), and quoted "it is fundamental that the judge,

the jury, and the litigants should understand the issues being tried before the testimony is concluded." 137 Va. at 394. In *Powell*, the Court held that the ruling in *Russell Lumber* "applies with greater force to post-verdict amendments of the pleadings." 231 Va. at 468.

The *ad damnum* clause is intended to inform the party who may be responsible for paying a judgment of the extent of the exposure which may exist. Permitting an amendment thereof post verdict would be extremely prejudicial to the defendant's right to such notice. The ruling in *Powell* is clear "that in a case of this kind, involving an unliquidated damage claim for personal injury, post-verdict amendments increasing the *ad damnum* may not be granted." 231 Va. at 467. Accordingly, plaintiff's motion to increase her *ad damnum* is denied.

### *Defendant's Motion to Set Aside the Jury Verdict*

### I. *Negligence and Proximate Cause*

Defendant contends that there was insufficient evidence of negligence and proximate cause to submit the case to the jury. Negligence and proximate cause are issues to be decided by a jury unless reasonable minds could not differ in evaluating the evidence. *Riley v. Harris*, 211 Va. 359, 362, 177 S.E.2d 630, 633 (1970). In evaluating defendant's challenge to the sufficiency of plaintiff's evidence, this Court must view the evidence and all reasonable inferences drawn therefrom "in the light most favorable to the plaintiff and resolve any reasonable doubt as to the sufficiency in his favor." *Meeks v. Hodges*, 226 Va. 106, 109 (1983). *Semones v. Johnson*, 217 Va. 293, 227 S.E.2d 731 (1976).

Negligence is the failure to use ordinary care. Ordinary care requires that a reasonable person take measures to avoid known dangers or dangers as are reasonably foreseeable. *Montgomery Ward & Co. v. Young*, 195 Va. 671, 673, 79 S.E.2d 858, 860 (1954). Plaintiff alleges that defendant failed to exercise ordinary care when it failed to secure earlier hospitalization of Eppling and when it failed to monitor his whereabouts pending hospitalization, in light of the facts known to it concerning Eppling's medical condition and prior suicide threats. Reviewing

the evidence before the Court in the light most favorable to the plaintiff, there exists sufficient facts from which reasonable minds could have found negligence.

Included among those facts is the following evidence. Defendant kept Eppling in its home for adults with full knowledge of his medical condition, including his prior suicide threats. Hartman, the administrator, recognized a pattern in Eppling's behavior that he had been progressively more delusional since before January 16, 1988. Hartman acknowledged that Southern Manor is not capable of taking care of someone who is suicidal. Hartman never communicated to Harris and Irving any information concerning Eppling's prior suicidal threats. Once the decision was made to hospitalize Eppling, it was not communicated to Irving, no one stayed with Eppling until the hospitalization could be effected, and his departure from the premises was never even reported to the administrator. On the basis of the foregoing facts, a jury could reasonable find that defendant failed to exercise ordinary care for Eppling. Where the evidence is such that reasonable men might differ as to its effect, it is for the jury to say whether the defendant failed to exercise ordinary care for the plaintiff's well being. *First & Merchants Nat. Bank v. County of Amherst*, 204 Va. 601, 132 S.E.2d 718 (1963).

Defendant maintains that plaintiff did not sufficiently establish proximate cause for the matter to be submitted to the jury. Proximate cause is the cause which in natural and continuous sequence produces the injury and without which the injury would not have occurred. *Beale v. Jones*, 210 Va. 519, 171 S.E.2d 851 (1970). There may be more than one proximate cause of an injury. *Schools v. Walker*, 187 Va. 619, 47 S.E.2d 418 (1948). There existed sufficient evidence before the Court upon which a jury could have reasonably concluded that the negligence of the defendant in not hospitalizing Eppling sooner or in not monitoring his whereabouts while awaiting the warrant to hospitalize put in motion a natural and continuous sequence--Eppling leaving the home unattended, walking to the Wasena Bridge, and jumping to his death. From the evidence, the jury could have concluded that absent the failure to hospitalize earlier or to monitor the whereabouts of Eppling, the death would not have occurred.

Defendant argues that Eppling's injury was not reasonably foreseeable and relies upon the testimony of its expert witness, Dr. Brown, who testified that even a trained psychiatrist has difficulty predicting suicide. Yet Dr. Brown attributed a significance of about 2.5 on a scale of 10 to Eppling's prior suicidal threats or ideations. When asked where on that scale he would be willing to take a chance with an individual's life, he responded, "double zero." A jury could have reasonably concluded that the defendant proximately caused Eppling's injuries by taking that "2.5" chance which their own expert testified should not have been taken, and, therefore, it was proper to submit the issue for their consideration.

Furthermore, the precise injury sustained need not have been foreseeable. It is sufficient if an ordinary person should have, under the circumstances, foreseen that an injury might occur. *Scott v. Simms*, 188 Va. 808, 51 S.E.2d 250 (1949). There was evidence from which the jury could conclude that the defendant should have foreseen possible injury to Eppling in the absence of hospitalization or monitoring, given his deteriorated condition, *e.g.*, *Jefferson Hospital, Inc. v. Van Lear*, 186 Va. 74, 41 S.E.2d 441 (1947). Accordingly, there existed sufficient evidence regarding proximate cause for the matter to be submitted to the jury.

## II. *Expert Testimony*

One issue, which has already been addressed in a pre-trial letter opinion, is whether the plaintiff must produce expert testimony to establish the standard of care owed by Southern Manor to Eppling. Plaintiff originally had three theories of liability: (1) that defendant should have hospitalized Eppling sooner; (2) that defendant should have monitored Eppling's whereabouts while arrangements were made for hospitalization; and (3) that defendant was inadequately staffed in terms of number of personnel and training. The Court ruled pre-trial that expert testimony would be required to assist the trier in fact as to the appropriate standards for addressing theory (3); con-

sequently, it was not pursued. However, the Court held pre-trial and again affirms that expert testimony was not necessary to assist the trier of fact with either the question of whether the plaintiff should have been hospitalized sooner or whether the plaintiff's whereabouts should have been monitored.

Southern Manor is not a health care provider; it has no medically trained staff and renders no medical treatment. Therefore, the expert testimony required in medical malpractice cases, *Grubb v. Hocker*, 229 Va. 172, 326 S.E.2d 698 (1985), is inapplicable. The personnel staffing Southern Manor were lay individuals without training; in fact, the aide who plaintiff charged with failing to monitor Eppling's whereabouts had only worked there for several months and had no prior experience at a home for adults. Consequently, the decisions concerning the care of Eppling made by that employee were those that would be made by any ordinary man, such as the triers of fact.

Nor were the jurors being asked to evaluate a trained medical decision by a psychiatrist as to when hospitalization should be effected. Rather, they were asked to rule upon the judgment of the lay staff of Southern Manor who were guided only by their common everyday observations of Eppling's behavior. While expert testimony may be necessary where a technical or complex matter is involved, it is not necessary to establish a nonmedical, administrative, ministerial, or routine care. See Annot., *Necessity of Expert Evidence to Support Action Against Hospital for Injury to or Death of Patient*, 40 A.L.R. 3d 515, 518 (1971).

While no authority has been cited concerning homes for adults, plaintiff cites four cases involving the suicide of a patient confined to a mental institution. In *Johnson v. Grant Hospital*, 286 N.E.2d 308 (Ohio App. 1972), *Paulin v. Shannick*, 289 N.W.162 (Mich. 1939), *Stallman v. Robinson*, 260 S.W.2d 743 (Mo. 1953), and *Wright v. State*, 300 N.Y.S.2d 153 (1969), the Courts ruled that expert testimony was not required to establish the standard of care owed by a psychiatric facility to protect a patient from suicidal attempts. This court is in agreement with those rulings. When the conduct of lay individuals without medical training is to be evaluated,

even in the context of a medical situation, expert testimony is not required to put the question before the jury. The standard of care owed by these individuals is one of ordinary care, and the trier of fact without the assistance of experts is fully capable of determining whether such standard has been met.

Plaintiff's motion to bar expert testimony on behalf of the defendant was overruled pre-trial. While the trier of fact may be capable of evaluating the performance of the medically untrained staff of Southern Manor, the testimony of expert witnesses might aid the jurors in addressing these matters. *Thurston Metals and Supply Company v. Taylor*, 230 Va. 475, 339 S.E.2d 538 (1986). Accordingly, the testimony of two psychiatrists, Dr. Shah and Dr. Brown, and the testimony of Donna Baber, a licensed administrator with the Virginia Department of Social Services, was admitted on behalf of the defendant. Defendant now complains, however, that the Court erred in limiting the testimony of these individuals.

With regard to the testimony proffered by the psychiatrists, the Court rules that their opinions as to whether Eppling was suicidal would be instructive to the jury in ascertaining whether there had been negligence on the part of the defendant in failing to secure earlier hospitalization. However, the Court refused to permit Dr. Shah and Dr. Brown to offer expert testimony concerning the monitoring of Eppling pending hospitalization. It was not established that either doctor had familiarity with the day-to-day operations of a home for adults. There was no evidence that either had ever spent time at a home for adults nor worked closely with any staff from an adult home. Permitting them to testify about a matter with which they had no particular expertise would simply be to permit them to substitute their opinion for that of the trier of fact. Whether an individual's behavior warrants monitoring pending hospitalization is a matter of common sense, not a medical decision.

The Licensing Administrator for the Department of Social Services was permitted to testify concerning the results of her investigation into the death of Eppling and to her conclusion that there had been no violation of the state regulations. The only limitation placed by the Court on this witness' testimony was to refuse admission

into evidence of a letter written by her which opined that Southern Manor was not at fault in any way for failing to prevent the suicide of Eppling. The Court refused to admit this letter because it went substantially beyond the issue of whether there had been a violation of any of the state regulations by Southern Manor, her area of expertise, and invaded the province of the jury, addressing the ultimate issue for their decision.

## III. *Jury Instructions*

Defendant objected to the granting of an instruction that it "had a duty to exercise reasonable care to safeguard Jackie Eppling from self-inflicted injury as his known medical condition may have required." Defendant does not challenge this instruction on the basis that it incorrectly states the law but rather on the ground that it is not supported by the evidence. Defendant contends that Southern Manor did not know that Jackie Eppling was suicidal and, therefore, it was inappropriate to grant this instruction. It is uncontradicted, however, that Southern Manor knew that Eppling was paranoid schizophrenic; it further knew that his mental condition was deteriorating in the days before his death; and it knew of two prior incidents of suicidal threats during his period of residency at Southern Manor. Instruction No. 11 does no more than to advise the jury to consider what mental condition may have been known to Southern Manor and to evaluate their duty in light of such information.

Defendant also challenges the Court's refusal to grant an unavoidable accident instruction in this case. An unavoidable accident is one "which ordinary care and diligence could not have prevented" or one occurring "in the absence of negligence upon the part of all the parties charged therewith." *Holbert v. Evans*, 209 Va. 210, 163 S.E.2d 187 (1968). In *Bickley, Adm'x v. Farmer*, 215 Va. 484, 211 S.E.2d 66 (1975), the Court stated, "It is only where there is a reasonable theory of the evidence under which the parties involved may be held to have exercised due care, notwithstanding that the accident occurred, then an unavoidable accident instruction is proper." 215 Va. at 488.

An accident is "an event or condition occurring by chance or arising from unknown or remote causes." Webster's Third New International Dictionary, page 11. Eppling's death was not an "accident" as defined by Webster's, as there was an intentional act on the part of Eppling. However, assuming for present purposes that suicide could be viewed as "an accident," the question becomes whether it resulted from human fault. As stated in *Holbert*, "Where the only evidence of the cause of an injury is that it resulted from human fault, an instruction on unavoidable accident is improper." 209 Va. at 215. Defendant argues that Eppling was not capable of fault or negligence and the defendant exercised due care. Despite the fact that Eppling had been long diagnosed paranoid schizophrenic, there was no evidence before the Court that he was not capable of negligence. During his daily living at Southern Manor, he was given great freedom to come and go as he wished and to be responsible for his own well being. He had not been declared incompetent and did not have a *guardian or committee.*

Eppling's death was caused either by his own fault due to his intentional act (contributory negligence was not raised) or by the fault of the defendant in failing to hospitalize or monitor, or both. Whatever determination is made as to this question of fault, the case would be inappropriate for an unavoidable accident instruction as the injury directly resulted from human fault. Eppling's death was neither an "accident" nor "unavoidable," and therefore, the instruction is improper.

## IV. *Is the Jury Verdict Excessive?*

Defendant contends that the $500,000.00 jury verdict, now reduced to $200,000.00 by this Court to conform to the *ad damnum* clause, is excessive compensation for the death of plaintiff's decedent and should be set aside. This Court is charged with the duty to set aside an award which shocks the conscience or gives the impression that the jury was biased in favor of the plaintiff or prejudiced against the defendant or has misunderstood the facts or the law. *Edmiston v. Kupsenel*, 205 Va. 128, 202, 135 S.E.2d 777, 780 (1964).

Defendant has cited a number of cases in which the Court set aside a verdict as excessive or granted remittitur. However, none of these cases involved an action for wrongful death. In a personal injury action or a suit for breach of contract, the damages sustained by the plaintiff are more readily ascertainable from the introduction of evidence concerning special damages, permanent disability, loss of income, and other such factors. In a wrongful death action, such as the present case, on the other hand, the trier of fact is addressing the far more nebulous concept of what value should be placed on the sorrow, mental anguish, and loss of solace suffered by the beneficiaries.

The fact that the verdict in this case is larger than this Court would have awarded had it been sitting as the trier of fact is not a sufficient basis for setting aside the verdict. *Modaber v. Kelley*, 232 Va. 60, 348 S.E.2d 233 (1986). Two of the statutory beneficiaries, the mother of the deceased and his sister, testified extensively concerning their relationship with the deceased and the great sorrow which they had suffered from the loss of companionship resulting from Eppling's death. On the basis of this testimony and their demeanor as may have been perceived by the members of the jury, it cannot be said that the jury's verdict was unfairly prejudiced or biased.

It would be incorrect for this Court to arbitrarily substitute its opinion for that of the jury. *Hoban v. Carter and Grinstead*, 226 Va. 361, 372, 310 S.E.2d 666 (1983). This court is no better suited to place a value on the life of Eppling than was the jury. Emotional distress and mental anguish were apparent from the testimony of the mother and sister at trial. The jury could have reasonably concluded from their demeanor that the emotional suffering caused by Eppling's death warranted the verdict returned. Under these circumstances, this Court cannot say that the verdict shocks the conscience or gives the impression that the jury acted from improper or illegal motives.

For all of the above-mentioned reasons, judgment will be entered in favor of the plaintiff in the amount of $200,000.00.