# CIRCUIT COURT OF THE CITY OF RICHMOND

Michelle Kearse-Jackson

v.

Farm Fresh Inc.,
d/b/a The Grocery Store

February 17, 1999

Case No. LC-765-3

BY JUDGE MELVIN R. HUGHES, JR.

In this case, arguing that the jury's verdict for $1.5 million is excessive, the defendant has renewed a request to set aside the verdict and for remittitur first made and denied at trial.

This is a slip and fall case where the plaintiff complained of slipping on spilled rice in the aisle of a supermarket owned and operated by the defendant. Plaintiff slipped and fell on October 7, 1993.

At trial, in addition to an issue of whether the defendant was liable, there was a question concerning connection of the fall with temporomandibular joint dysfunction (TMJ), a major component of plaintiff's damages. Two oral maxillofacial surgeons, one who treated plaintiff and another who performed an examination of plaintiff on defendant's behalf, had opposite views concerning whether the fall caused TMJ, especially given that plaintiff did not seek medical care for her jaw until fifteen months after the incident. At the post trial hearing on the renewed motion, defendant submitted that the question of liability was a jury issue but contended that the verdict is vastly disproportional. Defendant distinguishes between the claimed economic losses, which are roughly $50,000 in medical expenses, and noneconomic ones, which is the difference between that sum and the total verdict amount, roughly $1,450,000.

When the amount of the verdict is so great as to shock the court's conscience or is so out of proportion to the injuries as to suggest that it is not the product of a fair and impartial decision, it is the duty of the trial court to set the award aside. *Murphy v. Virginia Carolina Freight Lines, Inc.*, 215 Va. 770, 774 (1975); *Modabar v. Kelley*, 232 Va. 60, 69 (1986).

Plaintiff testified that she fell backwards striking her left side and head on the floor after her feet went out from under her. An emergency medical technician called to the scene testified that plaintiff did not exhibit any symptoms of head or jaw trauma, no swelling or bruising. However, the hospital emergency room record mentions that she complained of head pain. Plaintiff related that, following the incident, she experienced pain about the face and jaw for some time and that she experienced trouble opening her mouth with pain associated with chewing, speaking, and jaw function, until she decided to seek medical attention.

Dr. Joseph Niamtu, III, an oral and maxillofacial surgeon testified for plaintiff. He stated that, upon plaintiff's presentation in February 1995, according to history and his examination, he diagnosed plaintiff's condition as myofacial pain-dysfunction syndrome. This condition is a result of the large muscles associated the face and jaw joints becoming inflamed and spastic. He decided to treat plaintiff conservatively prescribing anti-inflammatory drugs, muscle relaxants, heat, and physical therapy.

After plaintiff's symptoms persisted, Dr. Niamtu performed arthroscopic surgery. After this procedure, plaintiff improved for a while but she went back to having pain and inability to open. Plaintiff could open her month about 20 to 30 millimeters as opposed to the normal 50 millimeters. After the arthroscopic surgery, plaintiff developed ankylosis where the jaw joint bone fuses leaving only a few millimeters opening.

Plaintiff's next surgeries involved an open joint procedure called arthroplasty where an incision is made from the front of the ear through the skin and muscle to access the joint. During the last of these procedures Niamtu conducted a coronoidectomy, a procedure to trim part of the joint. Later, after installing "total joints" Niamtu said that on December 1, 1998, "we took those joints out." Removal was necessary because plaintiff developed heterotopic bond formation where, for reasons unknown as in artificial joint replacement elsewhere in the body, abnormal bone growth ensues causing the joint to seize and lock. Now plaintiff has "no articulating surface in her joints, meaning that the ball and socket of her joint is absent." To curtail unusual bond formation plaintiff had undergone radiation treatment. Plaintiff testified that following

these procedures she suffered hair loss. Dr. Niamtu opined that, given the history and his course of treatment, plaintiff's TMJ was related to the fall.

Dr. Robert Campbell, an oral maxillary facial surgeon associated with the Medical College of Virginia testified for defendant. He examined plaintiff in July 1998. Based on his examination and review of the record, it was his opinion that plaintiff's TMJ was not related. He said the syndrome symptoms occur soon after a traumatic event in most cases. He saw plaintiff for a second time in January, 1999 and felt that plaintiff's condition had worsened, that the procedures she had undergone did not help, and that they possibly caused her symptoms to progress.

As noted, plaintiff testified she had facial pain and headaches after the fall. When she started having jaw lock, she decided to seek medical attention. She said she still has headaches, facial spasm, lack of sensation in her chin, pain in her temples, difficulty chewing, tasting, talking, and fatigue when talking. She expressed embarrassment due to problems speaking to others and mispronunciation of words. She has scars from surgery about the face and head and has had to use a mechanical device to open her mouth. She related these and other problems including a hospitalization for hydration.

Defendant urges that, due to disproportionality, the jury award should shock the court's conscience. Defendant has cited a number of cases supporting its position: *Bassett Furniture Industries v. McReynolds*, 216 Va. 897 (1976); *Hogan v. Carter*, 226 Va. 361 (1983); *Caldwell v. Seaboard System R.R.*, 238 Va. 146 (1989); *Reel v. Ramirez*, 243 Va. 463 (1992). These cases deal with the standards of review on the discretion of the trial court to order remittitur. Generally, the cases speak to the need for the trial court to articulate the grounds for its action in granting remittitur and that these must bear a reasonable relationship to the evidence.

Plaintiff, on the other hand, takes the position that the question of damages was one for the jury. There cannot be an exact formula by which general damages in a personal injury case can be measured, and the court is not free to substitute its assessment for that of the jury's had the court been in its place. Plaintiff cites these cases for the proposition: *Simmons v. Boyd*, 199 Va. 806 (1958); *Williams Paving Co. v. Kreidl*, 200 Va. 196 (1958); *Phillips v. Campbell*, 200 Va. 136 (1958); *Lilley v. Simmons, etc.*, 200 Va. 791 (1959).

The court is still of the view that the quantum of damages was one for the jury. The jury had the benefit of hearing plaintiff and two qualified medical specialists on plaintiff's condition. The experts presented two different views of the etiology of plaintiff's condition. I agree with plaintiff; there is no formula or yardstick designed to measure the amount a given plaintiff may be

due for pain and suffering. Questions about excessiveness must be determined upon the facts of each particular case. Each case is unique. While I might have made a different award, the jury is free to assign what it believes is a fair amount under the damages instruction based on evidence fairly and competently adduced according to the facts of the case.

For the foregoing reasons, the court will overrule the motion for reconsideration and the judgment order entered January 19, 1999, will be maintained.