## Staunton

WILLIAMS PAVING COMPANY, INCORPORATED, ET AL. v.
ELLEN M. KREIDL.

September 10, 1958.

Record No. 4805.

Present, Eggleston, C. J., and Spratley, Buchanan, Miller, Whittle and Snead, JJ.

The opinion states the case.

*James A. Howard* (*Breeden, Howard & MacMillan,* on brief), for the plaintiffs in error.

*J. Randolph Davis* (*Robert Friend Boyd; Davis & Boyd,* on brief), for the defendant in error.

MILLER, J., delivered the opinion of the court.

■■ Ellen M. Kreidl, hereinafter called plaintiff, obtained a verdict for $33,000 against Williams Paving Company, Inc., and Arthur Doggett for personal injuries sustained by her when an automobile in which she was riding collided with a truck operated by Doggett and owned by the corporation.

Defendants, Doggett and the corporation, appealed from the judgment confirming the verdict and assign as errors the court's refusal (1) to give instruction C-6, and (2) to set aside the verdict as excessive.

A description of the intersection where plaintiff was injured and the evidence showing how the collision occurred follows:

The vehicles collided on August 31, 1954, about 10 a.m., at the intersection of U. S. route 40 and State route 272 in Cecil county, Maryland. Route 40 extends eastwardly and westwardly, and route 272 extends in a northerly and southerly direction. The full width of route 40 at the intersection is 110.6 feet. It consists of two eastbound and two westbound hard-surfaced, traveling lanes, each approximately twelve feet wide, and these eastbound and westbound lanes are divided by a grass plot 27 feet wide. To the left of each inside hard-surfaced, traveling lane, there is an inset lane 11.6 feet wide and about 100 feet long, designed to be used by drivers intending to make left turns at the intersection. North and south of each outside hard-surfaced, traveling lane is an improved shoulder lane 12 feet wide. Route 272 is gravel surfaced, and north and south of the intersection it is 24 feet wide, but at the intersection its edges curve outwardly. Within the intersection it is 43 feet wide. Over the eastbound and westbound traveling lanes of route 40 are suspended traffic control lights to regulate the movement of traffic in the immediate area. On the grass plot at the intersection, to the east and west of the area between the two lights, are two signs facing east and west respectively, bearing the legend, "Stop For Traffic

On Right." They are to regulate traffic traveling eastwardly or west-wardly on route 40 and turning north or south at the intersection.

To help the reader visualize the intersection, a diagram, which concededly presents a fair reproduction of the physical aspects of the intersection and the immediate area, is set out below:

INTERSECTION
OF
MARYLAND STATE ROUTE #272
AND
U.S. ROUTE #40
CECIL COUNTY, MARYLAND.
SCALE. 1"=30'          AUGUST, 1957.
FRANK D TARRALL JR & ASSOCIATES
SURVEYORS & ENGINEERS
NORFOLK, VA - VIRGINIA BEACH, VA - PRINCESS ANNE COURTHOUSE, VA.

Ellen M. Kreidl, Austin Lopez, driver of the automobile in which plaintiff was seated, and Jesse Spence, occupant of an automobile that was standing in the inset lane on route 40 headed westwardly preparatory to making a left turn into route 272, testified that Lopez approached from the east along route 40 in the lane indicated number 2 on the diagram, and entered the intersection at a speed of 30 to 35 miles an hour when the light was green for westbound traffic. They also testified that they observed defendants' truck, which had been traveling eastwardly on route 40, as it turned to the left into route 272 and proceeded northwardly between the ends of the grass plot; that the light was green for the truck when on route 40 but red for traffic moving on route 272; that Doggett did not stop in the intersection, but proceeded on northwardly against the red light at about 10 miles per hour until his vehicle struck the left center of the automobile under the traffic light.

Plaintiff and Lopez further testified that when they were about 200 yards from the intersection, they noticed the green light for westbound traffic on route 40, and it continued to be green until they actually entered the intersection. These two witnesses, and Spence likewise, said that Lopez entered the intersection slightly before Doggett's truck left the area between the ends of the grass plot and proceeded to cross the traffic lanes of route 40 against the red light.

Doggett, who had traveled eastwardly along route 40 and turned northwardly on route 272, described how he entered the intersection, negotiated the turn and collided with the other vehicle in route 40, as follows:

"Q. What did you do when you approached the intersection of 272 and Route 40? And first of all, which lane, which road were you on before you turned?

   *      *      *      *      *      *      *

"A. I was on the little cutoff lane next to the two main lanes; little cutoff lane to the left.

   *      *      *      *      *      *      *

"Q. Tell the Court and jury what you did about making a turn, if you made one.

"A. I come up Route 40 till I got to this little turnoff next to the two lanes. The light was green ahead of me on the main route going

east. Then I makes a left turn on 272; as I make the left turn I see the sign in front of me says "Stop for Traffic On Right"; "Stop For Approaching Traffic."

"Q. Will you tell whether or not you changed gears at that point?

"A. I changed gears; when I first entered in third gear, then when I turned into the intersection I stopped and put it in low. It was a car beside me going the opposite direction. He was standing when I got in there.

"Q. When you say 'going in the opposite direction,' can you tell us whether or not he was making a left turn?

"A. He had made the left turn and was standing in the intersection as I approached it.

"Q. What did you do after you stopped?

"A. I stopped and waited until the light overhead of me of 272 turned green. Then I started to pull off. When I pulled off a little ways, before I pulled off I looked to my right, I didn't see anything coming; I didn't see anything to my right. When I started to pull off something hit me, Bam! just like that, and that is—

"Q. Did you ever see this car that was driven by Mr. Lopez?

"A. I didn't see it until after I was hit and was getting up out of the road.

*　　*　　*　　*　　*　　*　　*

"Q. Can you give us your speed when you started off from the stop sign?

"A. Just a creep, in low gear. It wasn't no speed. It wasn't enough for the speedometer to be working; just a creep in low gear when I started."

Maryland Trooper David C. Foster, who investigated the accident and testified as to finding debris in route 40 under the traffic light over the westbound lanes, also explained, without objection from any litigant, the legal significance under the Maryland statutes of the legend on the stop sign. He said that the sign "Stop For Traffic On Right" means that traffic that has properly entered the intersection from route 40 on a green light and is turning therein may proceed northwardly or southwardly on 272 against a red light provided there is no traffic on route 40 to the driver's right. His explanation of the legend's meaning is briefly stated as follows:

"A. Yes, sir; once you get into the intersection, you can go against the red or green light, either one—against the red light providing

there is nothing on Route 40 on your right and against the green light when it appears green for 272."

Instruction C-6, which defendants insist should have been given, follows:

"The Court instructs the jury that if you believe from the evidence that the traffic light for westbound traffic on Route 40 was red at the time Lopez began to cross Route 272, and further that the light was green for Arthur Doggett to cross Route 40, then there was no duty on Doggett to yield the right of way to Lopez; and if you further believe from the evidence that Lopez entered or crossed the intersection without regard for such approaching traffic, then Lopez was guilty of negligence, and if you believe further that such negligence solely caused the accident, then you should find your verdict for the defendants."

The court declined to give instruction C-6 and defendants excepted, asked for and obtained instruction C-7, below:

"The Court instructs the jury that if you believe that Doggett proceeded across Route 40 on a green light, for highway 272, after first stopping at the intersection in the exercise of ordinary care, then Lopez was bound under the law to stop his vehicle and grant Doggett the right of way, and if you believe Lopez failed in these particulars, then his failure was negligence and if you further believe such negligence was the sole proximate cause of the accident, then you shall find your verdict in favor of the defendants."

It is to be remembered that Doggett, the only witness to the accident who testified on behalf of defendants, said that he entered the intersection from the inset traffic lane upon an east-west green light and turned left or northwardly, and stopped between the ends of the grass plot until the lights changed to green for northbound traffic, and then proceeded slowly across the traffic lanes of route 40 to where the collision occurred. All the other witnesses to the accident denied that he stopped in the intersection and said that he proceeded northwardly on a red light.

It is thus apparent that the issue presented by instruction C-6 disregards Doggett's own affirmative testimony that he *stopped in the intersection* between the ends of the grass plot and started forward when the light changed to green for traffic on route 272. It presents only a partial and a somewhat misleading view of Doggett's testimony, and a theory that is unsupported by the evidence of any witness.

"Plainly an instruction cannot be given because it is in line with a litigant's theory unless that theory finds support in the evidence." *Campbell Soup Co.* v. *Davis, etc.,* 163 Va. 89, 95, 175 S. E. 743. 7 M. J., Instructions, § 7.

Instruction C-7 was supported by Doggett's testimony. It is in accord with his claim that he stopped in the intersection and then moved northwardly on a green light and that Lopez entered the intersection on a red light. We find no error in the refusal of instruction C-6, for C-7 fully and more correctly instructed upon defendant's evidence.

This brings us to the consideration of the claim that the verdict of $33,000 is excessive.

Plaintiff testified that the force of the collision threw her from the automobile to the hard surface of the roadway and tore most of her clothes from her body, that she received a broken nose and severe lacerations on her face, that she was carried by an ambulance to a hospital in Elkton, Maryland, where she remained for fifteen days, and during that time she suffered "terrible pains." Upon release from the hospital, she returned to her home in New York where she was confined for more than two months, and upon resuming her employment with the City of New York at the Syndenham Hospital, she was unable to perform the duties required in her position due to constant headaches and "not feeling well," and had to abandon her work with the city. Though she obtained other employment at a like salary, yet she lost her right to pension and future promotion which she enjoyed in her former position. She also said at the trial on May 6, 1957, that she still suffered from severe headaches and nervousness, had developed varicose veins on her limbs; had difficulty breathing as a result of her fractured nose, suffered from sinus attacks and was conscious of the fact that her memory had been impaired, all of which she attributed to the injuries she received. Her hospital, medical bills and loss of salary amounted to $961.53.

Dr. Helmuth Nathan, visiting surgeon at the Bronx Municipal Center and medical professor at the Albert Einstein College of Medicine, treated plaintiff upon her return to New York. When he first saw her, she was confined to her bed, and he described her lacerations, abrasions, and condition as follows:

"A. Yes. She had severe lacerations of the face, mainly on the right side; was a fractured nose and a marked deviation of the septum of the nose. She had severe laceration which could be compared

with a third degree burn on her chest, on the breast, mainly on the right side, including the nipple, on the abdominal wall, on the right lateral side. She had laceration on the right leg, the inside and over the kneecap. On the left side, both in the posterior aspect of the thigh, the inside and also on the lateral side and on her arms she had lacerations below the elbow at the dorsum of the hand; and on the left side, marked lacerations around the elbow, on the dorsum of the hand and in between the fingers of the left hand."

On later visits he found that she was troubled with her sinus, severe headaches and dizziness, and he referred her to a nose and throat specialist. Though she had no varicose when he first saw her, she later developed varicose veins in the area where she received wounds and a scar, and he attributed the development of these varicose veins on her leg to the injuries sustained in the accident, which he said would be permanent and might necessitate surgery.

Dr. Jervis S. Taylor, Jr., of Norfolk, Virginia, who examined plaintiff on the morning of the trial and testified at the instance of defendants, said that his examination revealed a triangular depigmented area in the region of the right forehead; a small prominence of the juncture of the nasal bones with the nasal cartilage, but no lateral disalignment from the outside; an area of depigmentation about five inches in length, starting at the top of the right breast and extending directly over the breast about three or four inches, with a smaller area of depigmented skin slightly below the right breast, and above the left breast there was a depigmented area about two inches in length, all of which depigmented area represented abrasive loss of superficial skin. On plaintiff's right hand over the knuckles were small white scars resulting from very deep abrasions suffered in the accident. Her left arm disclosed an abrasion area which had healed with loss of pigmentation of the superficial skin extending from the elbow to the knuckles. There was an area of abrasion residual on both knees, and from the knee to the ankle of her right leg appeared an area of depigmentation due to abrasive injury. Dr. Taylor made no examination of the interior of plaintiff's nose but stated that she could breathe clearly through both sides. However, plaintiff complained that she had blockage of the nose since the accident when she suffered from colds. He found some enlargement of the veins in plaintiff's left leg, but observed no tortuous condition and expressed the opinion that her present disability consisted of some scars and disfigurement which were "primarily of cosmetic nature."

Defendants cite several cases in which verdicts for personal injuries were set aside or the plaintiffs put on terms to accept lesser sums, and plaintiff relies upon several decisions where comparable sums for personal injuries were not disturbed. Yet the inadequacy or excessiveness of each verdict must be determined on the facts of the case, the character of the injuries sustained, and their resultant effect upon the injured party, which are never identical, and but seldom similar. Hence the amounts of respective verdicts for somewhat like physical injuries are by no means controlling or determinative of whether a verdict under consideration is excessive or not, or inadequate or not.

There is no legal method or yardstick by which the precise value of human pain and suffering may be determined, nor is there any formula by which personal disfigurement may be appraised and a certain sum fixed upon as the true resultant damage. The determination of the quantum of damages in this character of action is peculiarly within the province of the jury, but its authority to fix the amount of damages is not arbitrary or unlimited. Yet if the amount awarded is not so out of proportion to the injury and loss suffered as to evince prejudice, partiality, or corruption by the jury or show that it was actuated by a mistaken view of the merits of the case, then the award should not be disturbed. *Atlantic Coast Line R. R. Co.* v. *Withers, et al.*, 192 Va. 493, 65 S. E. 2d 654; *National Fruit Product Co., Inc.* v. *Wagner, etc.*, 185 Va. 38, 37 S. E. 2d 757; *Colonna Shipyard, Inc.* v. *Dunn*, 151 Va. 740, 145 S. E. 342; 5 M. J., Damages, §§ 51-54, inclusive, pp. 542 to 545.

"There is no fixed rule or exact standard by which damages can be measured in personal-injury cases. The law does not assume that a particular injury calls for a definite amount of compensation, for a just compensation may vary widely in different cases, even where the physical injury is the same, especially where the injury is permanent or where physical or mental pain and suffering are involved. The amount to be awarded is therefore largely a question for the jury to be determined by it in view of the facts and circumstances of each particular case." 15 Am. Jur., Damages, § 71, p. 479.

The verdict was approved by the trial court, and under all the facts and circumstances in evidence, it does not shock our conscience or sense of justice. It follows that it should not be disturbed.

*Affirmed.*