COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judges Malveaux and Callins
Argued by videoconference

LINDSAY D. SIGHTLER

                                MEMORANDUM OPINION[*] BY

v.      Record No. 0535-24-1         JUDGE MARY BENNETT MALVEAUX
                                       MAY 27, 2025

ASHLEY LUBECKI, D.O., ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge

Randy D. Singer (Rosalyn K. Singer; Maryam M. Atty; Singer
Hoffman, LLC, on briefs), for appellant.

Rodney S. Dillman (Julie Mayer; Michael E. Olszewski; Edward W.
Bailey; Hancock, Daniel & Johnson, P.C., on brief), for appellees.


Lindsay Sightler filed a medical malpractice suit against Ashley Lubecki, D.O., Lubecki's

employer, Bayview Physicians Services, P.C., and others, alleging that they failed to properly

diagnose and treat her breast cancer.  A jury returned a partial verdict in Sightler's favor and

awarded her $98,000.  On appeal, Sightler argues that the circuit court erred by denying her post-

trial motion for an investigative hearing and a new trial based on juror misconduct, denying her

motion for additur, and permitting a defense expert to testify to certain opinions.  For the following

reasons, we affirm the judgment of the circuit court.

## I.  BACKGROUND

On appeal, we "view the facts in the light most favorable to the prevailing party below."

*Friedman v. Smith*, 68 Va. App. 529, 543 (2018) (quoting *Blackson v. Blackson*, 40 Va. App.

507, 517 (2003)).

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

## A. Complaint

Sightler filed a medical malpractice suit against Ashley Lubecki and Bayview Physician Services, P.C., alleging that the defendants were negligent in failing to properly diagnose and treat her breast cancer.[1]  Sightler first mentioned a lump in her breast to Lubecki in September 2018.  Sightler reported continuing issues over the following year, including two lumps in her breast that were also noted on an ultrasound in September 2019.  But it was not until she saw a different doctor in January 2020 that she was diagnosed with "invasive ductal carcinoma," a type of breast cancer.  Her treatment plan involved a "modified radical mastectomy" and "surgical exploration of her left axilla," as well as "aggressive chemotherapy and radiation therapy, followed by ten years of hormonal deprivation."  Sightler alleged that the damages she suffered as a result of her treatment were caused by the defendants' "failure to diagnose [the cancer] in a timely manner and the prescribing of contraceptives containing estrogen and progesterone."  Sightler prayed for judgment against the defendants jointly and severally, in the amount of $2,400,000 plus pre-judgment interest and costs.

## B. Expert Designation

In preparation for trial, Lubecki designated Maggie DiNome, M.D., a board-certified surgical oncologist specializing in breast oncology, as an expert witness.  DiNome was expected to testify that Lubecki's treatment of Sightler "did not cause or contribute to" the cancer's presence in Sightler's lymph nodes, because "she would have still required mastectomy, axillary node dissection, radiation, chemotherapy, and hormone suppressant medications" even if she had been diagnosed prior to January 2020.  DiNome would explain that

---

[1] Sightler also filed suit against Andrew Zasada, M.D., Stafford Brown, M.D., Bayview Medical Center, Inc., and Hampton Roads Radiology Associates, P.C.  The circuit court ultimately dismissed Zasada from the case.  On Sightler's motion, the action was partially nonsuited as against Bayview Medical Center.  The jury returned a verdict against Sightler for Brown and Hampton Roads Radiology Associates.

> [t]he fact that Ms. Sightler had two palpable masses in two separate quadrants of the breast indicate[s] that the "burden" of the cancer was heavy, and more likely than not she had additional areas of cancer in her breast that were not yet detectable on the imaging or via palpation . . . . [O]nce a malignant mass is palpable, the cancer has already invaded one or more of the axillary nodes.

DiNome was further expected to testify that "more likely than not at least two masses were in Ms. Sightler's breast in September of 2018, and she had axillary nodal invasion" and that "because there were multiple locations of the cancer in 2020, it is more likely than not that the same was true in 2018, whether or not they were detected on imaging."

In her deposition, DiNome was asked about the relationship of a palpable mass in the breast to the cancer's presence in the lymph nodes. She answered that "if it's a multifocal palpable mass, then more likely than not there'll be lymph node disease." She agreed this was a "pretty major distinction" from her designated opinion that "if the patient has a palpable mass, the cancer has already invaded one of the axillary nodes." She clarified that "it doesn't even have to be palpable," but a patient has "a more likely than not chance of having lymph node disease" if "multifocal multicentric masses, or cancers" are present in the breast.

Sightler filed a motion *in limine* to exclude those certain portions of DiNome's deposition opinions that differed from those that were designated. Specifically, Sightler highlighted that whereas DiNome's designated opinion was that "a single palpable mass 'almost always' means lymph node involvement," she testified in her deposition "that a multi-focal palpable mass (at least two masses) more likely than not meant lymph node involvement (perhaps 60% of the time)." Sightler argued that DiNome should not be permitted to testify to the opinion "that when you can palpate more than one mass it means that the cancer has probably invaded the lymph nodes," because this opinion "r[a]n contrary" to the designation requirements of Rule

- 3 -

4:1(b)(4)(A)(i), as interpreted in *John Crane, Inc. v. Jones*, 274 Va. 581 (2007). The circuit court took the motion under advisement.

C. Trial Proceedings

At trial, Sightler renewed her objection to the portion of DiNome's testimony concerning the relationship of the number of palpable masses to the cancer's presence in the lymph nodes, because "she changed . . . the number of masses required" to discern whether cancer has invaded the nodes from "a malignant mass" to "more than one mass," and she also "went from [a] certainty standard to a more likely than not standard." The circuit court overruled the objection, and Sightler noted a continuing objection to DiNome's expected testimony on that specific topic.

On direct examination, DiNome opined that "had [Sightler] been diagnosed when she first presented in 2018, she would have still required the mastectomy, the lymph node dissection, the chemotherapy, the radiation and the hormone blocking therapy," because Sightler "had presented . . . with the palpable finding" and "had extensive evidence of lymph node disease already." DiNome testified that Sightler incurred "[n]o additional bills" because of Lubecki's care, as the treatment options "would have been the same." DiNome further testified that "when women present with palpable lumps, the amount of tumor is larger than if they presented with a cancer that was found on regular screening mammogram," and noted that "whether or not [Sightler] felt one or two lumps, . . . on the final pathology she did have very extensive disease." DiNome also explained that "multicentric multifocal disease means there's more than one focus of breast cancer . . . multifocal means there's more than one in the same quadrant. And multicentric means there's more than one but in different quadrants of the breast." She then noted that Sightler's "ultrasound in September of 2019 showed two abnormalities . . . [in] two separate quadrants of the same breast."

On cross-examination, Sightler asked DiNome if her designated opinion was correct that "once a malignant mass is palpable, the cancer's already invaded one or more of the axillary nodes" and that "if it is a palpable mass, it almost always involves lymph node invasion." DiNome replied that those statements "are not correct in and of themselves," and clarified, "if [Sightler] presented with two palpable masses that turned out to be cancer, there is, more likely than not, probability that the patient already has lymph node disease." To DiNome it was "irrelevant whether or not she felt one [mass] or two based on the extent of disease."

Sightler and her family members testified that Sightler experienced increased anxiety due to her diagnosis. Sightler herself believed her panic attacks and "really bad anxiety" were partly due to her cancer diagnosis and that anxiety is "more of a regular occurrence now." Her mother testified that Sightler is anxious about "everything" now, where "she was never an anxious person before." Sightler's husband also stated that "[h]er anxiety is through the roof now."

The jury returned a partial verdict for Sightler in the amount of $98,000 against Lubecki and Bayview Physicians Services.

### D. Post Trial Motions

*1. Motion for Investigative Hearing and New Trial*

After trial, Sightler moved for an evidentiary hearing to determine whether a new trial should be ordered against Lubecki and Bayview Physicians Services. She alleged that one of the jurors, Juror Watson, had: (1) failed to reveal relevant information—the fact that she had previously worked in healthcare—during voir dire; (2) made up her mind before the conclusion of the evidence; (3) considered herself "an advocate" for Lubecki and her children; and (4) added extraneous information into the jury deliberations by referencing her healthcare experience "as a reason for the jury to find in favor of Dr. Lubecki." As a basis for these allegations, Sightler cited the affidavits of three jurors and one alternate juror, Jeffrey Matthews, whom Sightler

- 5 -

allegedly called shortly after the jury announced its verdict. The circuit court denied Sightler's motion on the first, second, and third grounds, noting that those allegations were based entirely upon Matthews's testimony and would "run afoul" of Virginia Rule of Evidence 2:606(b), but granted a hearing on "extraneous evidence."

At the hearing, Juror Henri Ellis testified that Watson told other jurors that due to having worked in her father's dental practice, she knew "how things worked in the medical field." Watson stated that "if [they] found for Mrs. Sightler, that Dr. Lubecki's profession would be ruined . . . because that's what happens. That's the way it works." On the subject of medical records, Watson also commented, "you know, that's what happens," but did not mention her work for her father in that context. Watson's behavior did not influence Ellis or affect Ellis's willingness to continue discussing the evidence.

Juror Brian Hall testified that Watson "referenc[ed] her family's medical practice and working for her family and then saying something to the effect of, 'That's not how it's done.'" Hall recalled Watson "repeatedly" using the term "preferred modality" in reference to "diagnosing breast cancer," although Hall was unsure "whether or not [Watson's] . . . background in the medical field directly influenced that." When asked whether Watson's comments "impact[ed] the deliberations in any way," Hall responded, "Yes. I believe it did. She seemed very firm in her resolve. She did not seem to want to even discuss it any further. She had made up her mind, and that was it."

Juror Candy Watson ("Candy")[2] testified that Watson told the jury "her parents worked in the medical field and she didn't feel like she should be here in the first place." Candy could not recall any ways in which Watson "used her experience outside of the jury room to buttress her opinion in the jury room."

---

[2] Sightler's motion indicates that Candy Watson is not related to Lindsay Watson.

Neither Matthews nor Watson testified. The circuit court did not find a probability of prejudice to Sightler and denied her motion.

2. *Motion for New Trial, Additur, or New Trial on Damages*

Sightler also filed a motion for a new trial as against Lubecki or, in the alternative, additur or a new trial on damages under Code § 8.01-383.1(B). Her motion was based on the circuit court's ruling that DiNome "was allowed to express opinions about when the cancer travelled to the lymph nodes . . . even though the opinions were not designated pursuant to *John Crane* and, in fact, [were] contradictory to the opinions that had been designated." Sightler posited that the jury's damages award, representing only "a fraction of the medical bills in the case," was due to factual findings about causation that had been "improperly influenced" by DiNome's testimony.

The circuit court noted that the jury could have determined, based on DiNome's testimony, "that even if the cancer had been diagnosed when it should have been diagnosed, the treatment and prognosis would have been the same and that the only damages [Sightler] suffered was increased anxiety." Accordingly, the court denied Sightler's motion as it "did not feel as a matter of law that $98,000 for anxiety was an additur in nature."

This appeal followed.

II.  ANALYSIS

A.  Defense Expert

Sightler argues that the circuit court erred in permitting DiNome to testify about the number of palpable malignant masses required to discern whether cancer has invaded the lymph nodes, because DiNome's trial testimony on that topic "differed markedly" from her designation. Lubecki counters that Sightler has waived this objection by eliciting the objected-to opinion through cross-examination. We agree with Lubecki.

"Generally, when a party unsuccessfully objects to evidence that he considers improper and then introduces on his own behalf evidence of the same character, he waives his earlier objection to the admission of that evidence." *Combs v. Norfolk & W. Ry.*, 256 Va. 490, 499 (1998). "[T]he mere cross-examination of a witness or the introduction of rebuttal evidence, either or both, will [not] constitute a waiver of an exception to testimony which has been duly taken"; instead, "[t]o constitute such a waiver the party objecting to the evidence must have gone further and introduced on his own behalf testimony similar to that to which the objection applies." *Drinkard-Nuckols v. Andrews*, 269 Va. 93, 102 (2005) (quoting *Snead v. Commonwealth*, 138 Va. 787, 801-02 (1924)). There is also "the requirement that the subject matter of the evidence at issue be the same as the subject matter of the evidence to which an objection was made." *Id.*

Here, the extent of DiNome's testimony about palpable masses on direct examination was that Sightler presented in 2018 with a "palpable finding." DiNome did not indicate that any certain number of palpable masses was among the "extensive evidence of lymph node disease" already present in 2018, nor did she specify what that evidence was. It was not until cross-examination that Sightler asked whether DiNome recalled her designated opinion that, "once a malignant mass is palpable, the cancer's already invaded one or more of the axillary nodes" and that "if it is a palpable mass, it almost always involves lymph node invasion." DiNome clarified in response that "if [Sightler] presented with two palpable masses that turned out to be cancer, there is, more likely than not, probability that the patient already has lymph node disease." This is the exact portion of DiNome's testimony to which Sightler had previously objected.

Sightler did not merely cross-examine DiNome about an opinion that Lubecki had previously elicited on direct examination. Rather she brought up a new topic—the designated

- 8 -

opinion about the relationship of palpable masses to cancer in the lymph nodes—and inquired about the correctness of those statements. Sightler proceeded to question DiNome about that exact opinion, thus inviting her to discuss the very same subject matter that, on appeal, she asserts should not have been permitted.[3] The same-evidence principle is "properly and logically applicable in any case . . . if the party who has brought out the evidence in question, or who has permitted it to be brought out, can be fairly held responsible for its presence in the case." *Pettus v. Gottfried*, 269 Va. 69, 79 (2005) (quoting *Whitten v. McClelland*, 137 Va. 726, 741 (1923)). By eliciting DiNome's opinion about the relationship of palpable masses to lymph node activity, Sightler waived her objection to that testimony, and we do not consider this assignment of error on appeal.

## B. Juror Bias

Sightler argues the circuit court erred in denying in part her motion for an investigative hearing based on juror misconduct, because Watson made up her mind "in the middle of trial" and held "a concealed bias" in favor of Lubecki and her children.

"Although juror testimony may be received upon an issue of juror misconduct, hearsay affidavits are not admissible in support of a motion for a new trial." *Com. Union Ins. Co. v. Moorefield*, 231 Va. 260, 265 (1986). However, "such an affidavit may be sufficient to require the trial court to investigate the matters recited in the document." *Id.* "Whether a trial court should examine jurors is a matter addressed to the court's sound discretion, and, absent an abuse of discretion, its decision will not be disturbed on appeal." *Bradshaw v. Commonwealth*, 228

---

[3] Sightler argues that DiNome based this very opinion during direct examination on the conclusion that "Sightler's disease was multicentric." But DiNome only addressed the number of lumps on direct examination two times, neither of which related to her ultimate opinion that Sightler "had extensive evidence of lymph node disease already" when she first presented to Lubecki in 2018. The relationship of the number of palpable masses to the presence of cancer in the lymph nodes, the same subject matter to which the objection was made, was an issue raised by Sightler herself on cross-examination. *See Drinkard-Nuckols*, 269 Va. at 102.

Va. 484, 491 (1984). And "unless there is a substantial reason to believe that juror misconduct has occurred, a court may decline to question the other jurors in that regard." *Id.*

Pursuant to Virginia Rule of Evidence 2:606(b)(i),

> [d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

A juror may testify, and his affidavit may be considered, only regarding whether: (1) extraneous prejudicial information was brought to the jury's attention; (2) "an outside influence was improperly brought to bear" on any juror; (3) a mistake was made on the verdict form; or (4) a juror's statements demonstrated that "a racial/national origin stereotype or animus was a significant motivating factor" in their vote. Va. R. Evid. 2:606(b)(ii)(a)-(d). This rule reflects the long-settled law in Virginia "that the affidavits or the testimony of jurors to impeach their own verdicts are to be received with great care and caution and only in exceptional cases, and in order to prevent a failure of justice." *Harris v. Commonwealth*, 13 Va. App. 47, 51 (1991) (quoting *Phillips v. Campbell*, 200 Va. 136, 140 (1958)).

Here, the circuit court granted Sightler's motion for an investigative hearing only on "extraneous evidence," and denied the motion on Sightler's other grounds alleging that Watson "made up her mind midtrial" and "considered herself an advocate of doctors and children." The trial court correctly determined that these latter grounds do not fall within any of the exceptions to Rule 2:606(b). Even if Watson did make up her mind mid-trial and considered herself an advocate for Lubecki and her children, these were Watson's interior thoughts, and "[t]he principle is well settled that a juror may not impeach a verdict solely upon his mental processes."

*Harris*, 13 Va. App. at 52 (quoting *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 209 (1987)).[4]

## C. Extraneous Information

Sightler argues the circuit court erred in denying her motion for a new trial because Watson "brought extraneous information into jury deliberations."

"A motion for a new trial on the ground of juror misconduct is addressed to the sound discretion of the trial court and, unless there has been abuse of that discretion, the judgment below will not be reversed on appeal." *Com. Union Ins. Co.*, 231 Va. at 265. The "mere suspicion of injustice," even if based upon some irregularity that occurred at trial, is not sufficient to warrant setting aside a verdict. *Id.* This is because "[t]he importance of avoiding another trial, if the first trial was fair, is of paramount importance." *Id.* (quoting *Yellow Cab Corp. v. Henderson*, 178 Va. 207, 221 (1941)). In addition, "the mere fact of juror misconduct does not automatically entitle [a] litigant to a mistrial." *Robertson v. Metro. Wash. Airport Auth.*, 249 Va. 72, 76 (1995). "Instead, the trial court, in the exercise of sound discretion, must determine whether such misconduct probably resulted in prejudice. And the burden of

---

[4] Sightler argues that *Haddad v. Commonwealth*, 229 Va. 325 (1985), supports her position that she is entitled to a new trial because here, like in *Haddad*, the evidence demonstrates that the juror at issue was not impartial throughout the entirety of the case. In *Haddad*, our Supreme Court held that evidence that a juror displayed bias against the defendant to a third party during trial was sufficient to establish a probability of prejudice to the defendant. *Id.* at 330-31. But *Haddad* is factually distinguishable from this case. In *Haddad*, the juror's misconduct was discovered while evidence was still being heard, and the motion for mistrial came before the jury had the chance to deliberate. *Id.* at 326-27. Here, by contrast, the alleged misconduct was not discovered until after the jury returned its verdict. Additionally, *Haddad* addressed a different legal issue: "whether juror misconduct in the form of expressions of opinion made by a juror to third persons during the trial proceedings should result in a mistrial." *Id.* at 329. We thus find the ruling in *Haddad* inapposite to the facts of the instant case, which are governed by the application of Rule 2:606(b)(ii) and its provisions related to juror testimony post-trial.

establishing that probability is upon the party moving for a mistrial." *Id.*; *see also Haddad v. Commonwealth*, 229 Va. 325, 300 (1985).

"A juror may not properly receive any information about a case he is hearing except in open court and in the manner provided by law." *Brittle v. Commonwealth*, 222 Va. 518, 522 (1981). "The reception of any evidence by the jury . . . in addition to that produced at trial is ground for setting aside the verdict whenever there is sufficient ground to believe that one of the parties in a civil suit . . . has been prejudiced by receipt of the information." *Harris*, 13 Va. App. at 51 (quoting *Brittle*, 222 Va. at 522).

The evidence adduced at the investigative hearing does not support Sightler's allegation that Watson introduced "extraneous information" into the jury's deliberations. Watson told other jurors she knew "how things worked in the medical field" and that "if [they] found for Ms. Sightler, that Dr. Lubecki's profession would be ruined . . . because that's what happens. That's the way it works." This does not amount to extraneous information about the case, because Watson did not actually explain "how things worked in the medical field"—she merely alluded to the fact that she knew about it. Watson's comment suggesting that an adverse medical malpractice ruling may have negative consequences for a doctor's career was mere generalized speculation, not actual "information." Similarly, Watson's saying, "That's not how it's done," and using the term "preferred modality," does not amount to introducing extraneous information, because Watson did not proceed to explain to the jury "how it's done" or offer any detail or information about the "preferred modality" for diagnosing breast cancer. And Watson's statement that she "didn't feel like she should be [t]here in the first place" is evidence of Watson's mental processes, not "information" related to the issues in the case. *See* Va. R. Evid. 2:606(b)(i); *see also Harris*, 13 Va. App. at 52. Further, Watson did not use her experience

- 12 -

outside the jury room, in any medical or non-medical capacity, to "buttress her opinion in the jury room."[5]

Though Watson may have obliquely referenced her experience in her father's dental practice, she never introduced any information to the jury that was not already properly in evidence. She did not explain her vague comments about "how it works" by providing any relevant specifics about practices in the medical field, breast cancer diagnosis or treatment, anxiety, or any other issue germane to Sightler's medical malpractice claim.[6] Only one of the three jurors who testified believed that Watson's conduct impacted deliberations—and even then, Hall's belief to that effect was based only on her own assessment that Watson "had made up her mind," not on any information Watson brought into the jury room. Sightler has failed to provide sufficient ground to believe that Watson's conduct prejudiced her by providing the jury with extraneous information about her case. Accordingly, the circuit court did not abuse its discretion in denying Sightler's motion for a new trial based on juror misconduct.

---

[5] As for the alleged phone call to Matthews, neither Watson nor Matthews testified about that purported interaction, so it cannot serve as support for Sightler's argument. *See Com. Union Ins. Co.*, 231 Va. at 265.

[6] Sightler likens this case to *Harris*, but we find that case to be inapposite. In *Harris*, a juror indicated during deliberations "that he was associated in some fashion with the Department of Corrections and proceeded to explain to the jury how the parole system would come into play with regard to various sentences that the jury was considering." 13 Va. App. at 49. The foreman of the jury estimated that "a significant number of the jurors would not have voted for such a substantial sentence except for the input from this juror." *Id.* Here, in contrast, Watson's comments about "what happens," "how it's done," and "how it works" were general statements that did not provide any specific information regarding the issues being discussed, while the juror in *Harris* affirmatively offered information based on his inside knowledge of the correctional system. Further, the ramifications of Watson's conduct were not so extreme as those in *Harris*: where in *Harris* a "significant number" of juror votes were swayed in favor of a longer sentence, only Hall stated that he "believe[d]" that Watson's comments "impact[ed] the deliberations" but did not identify the foundation for his belief by demonstrating specifically how the deliberations were impacted. Neither Ellis nor Candy testified that Watson's conduct had any effect on the jury.

D. Additur

Sightler asserts that the circuit court erred in denying her motion for additur, because the damages attributable to Lubecki exceeded $200,000 but the jury only awarded $98,000.

"The court's decision to accept or reject a jury's award of damages is reviewed by an appellate court for abuse of discretion." *City-To-City Auto Sales, LLC v. Harris*, 78 Va. App. 334, 348 (2023). It is well-established that

> a jury's award of damages may not be set aside by a trial court as inadequate or excessive unless the damages are so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion.

*Downer v. CSX Transp.*, 256 Va. 590, 594 (1998). Similarly, a circuit court will not set aside a verdict as inadequate "merely because the court may have awarded a larger or smaller sum had it been the trier of fact." *Id.* "Hence, in deciding whether the jury's award is inadequate, the test is whether reasonable people could *not* conclude that the . . . award was reasonable compensation in this case." *Id.* at 595. Ultimately, "if the amount awarded is not so out of proportion to the injury and loss suffered as to evince prejudice, partiality, or corruption by the jury or show that it was actuated by a mistaken view of the merits of the case, then the award should not be disturbed." *Dinwiddie v. Hamilton*, 201 Va. 348, 352 (1959) (quoting *Williams Paving Co. v. Kreidl*, 200 Va. 196, 204 (1958)).

Still, the jury's "authority to fix the amount of damages is not arbitrary or unlimited." *Id.* (quoting *Williams Paving Co.*, 200 Va. at 204). A circuit court may revisit a jury's damages award under Code § 8.01-383.1(B), which provides that:

> [i]n any action at law when the court finds as a matter of law that the damages awarded by the jury are inadequate, the trial court may (i) award a new trial or (ii) require the defendant to pay an amount in excess of the recovery of the plaintiff found in the

- 14 -

> verdict. If either the plaintiff or the defendant declines to accept
> such additional award, the trial court shall award a new trial.

Such a remedy is appropriate where the damages awarded "bear[] no reasonable relation to the damages suggested by the facts in the case, and [are] manifestly out of line and at variance with the facts." *Bradner v. Mitchell*, 234 Va. 483, 486 (1987) (quoting *Glass v. David Pender Grocery Co.*, 174 Va. 196, 202 (1939)). In such cases, "courts must exercise control in the interest of fairness and justice." *Id.* (quoting *Glass*, 174 Va. at 202).

Sightler argues that her motion for additur could have been "granted based solely on the amount awarded by the jury as compared to the damages proven." But she cites no authority—and we are aware of none—supporting the proposition that the ratio of damages awarded to damages proven is a relevant factor. Rather, a jury's award is inadequate if reasonable people could *not* conclude that $98,000 was reasonable compensation. *See Downer*, 256 Va. at 595. In this case, DiNome testified that, even if Sightler had been diagnosed when she first presented in 2018, all the same treatments would have been required. The jury was entitled to credit this testimony. *See Harvey v. Flockhart*, 65 Va. App. 131, 146 (2015) ("The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." (quoting *Sandoval v. Commonwealth*, 20 Va. App. 133, 138 (1995))). In addition, Sightler and her family members testified that Sightler's increased anxiety was related to the cancer diagnosis. The jury was entitled to infer that the increased anxiety was attributable to Sightler's late diagnosis, but also could have reasonably concluded that only anxiety-related damages were attributable to Lubecki and not those related to Sightler's treatment, based on DiNome's credible testimony that the treatment would have remained the same even if Sightler had been diagnosed earlier. In light of this, the award was not so out of proportion to the injury as to evidence prejudice, partiality,

- 15 -

corruption, or mistake on the part of the jury, *see Dinwiddie*, 201 Va. at 352, and we decline to disturb it.

### III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*